UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **JAMES CRABBE,** | : | Case No. 1:19-cv-893 |
| 869 Eagleview Court | : | |
| Loveland, Ohio 45140 | : | Judge _____ |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **THE PROCTER & GAMBLE** | : | **COMPLAINT** |
| **COMPANY,** | : | |
| CT Corporation System | : | |
| 4400 Easton Commons Way, Suite 125 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| and | : | |
| | : | |
| **THE PROCTER & GAMBLE** | : | |
| **U.S. BUSINESS SERVICES** | : | |
| **COMPANY,** | : | |
| CT Corporation System | : | |
| 4400 Easton Commons Way, Suite 125 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| Defendants. | : | |

## PARTIES

1. Plaintiff James Crabbe is a naturalized United States citizen and a resident of Ohio.

2. Defendant The Procter & Gamble Company is a for-profit corporation incorporated under the laws of the state of Ohio.

3. Defendant The Procter & Gamble U.S. Business Services Company is a wholly-owned subsidiary of The Procter & Gamble Company. It is a for-profit corporation incorporated under the laws of the state of Ohio.

**JURISDICTION AND VENUE**

4.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Mr. Crabbe's claims arise under the law of the United States, namely, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, which confers jurisdiction by 20 U.S.C. § 1132(e)(1).

5.  Venue is proper in the Southern District of Ohio, Western Division, under 28 U.S.C. § 1391(b) because Mr. Crabbe was employed in this Division and District and the unlawful conduct alleged in this Complaint has taken place within this Division and District.

6.  Defendants denied Mr. Crabbe's appeal of his claim for benefits on October 25, 2018. This lawsuit is brought timely within two years of the denial of Mr. Crabbe's appeal.

**FACTUAL ALLEGATIONS**

7.  Plaintiff James Crabbe was born in the United Kingdom.

8.  Mr. Crabbe began working for P&G UK in April 1984.

9.  After almost twenty-four years of working for the company in Britain, P&G offered Mr. Crabbe the opportunity to localize to the United States.

10. Mr. Crabbe was concerned about adverse effects on his retirement income if he were to move to the US. In order to understand the consequences of localizing, Mr. Crabbe consulted with Mauricio Chavarria, a US-based P&G International Pensions representative, throughout the fall of 2007.

11. Mr. Crabbe also carefully reviewed P&G's Administrative Regulations Supplementary Retirement Income Policy ("the Policy," attached hereto as Exhibit A).

12. The Policy was designed to counteract any loss in retirement benefits that an employee would incur by moving from another country to the US. To prevent an employee from being monetarily penalized for localizing, P&G set an IRA Target that the employee's retirement

income would not dip under.  If an employee's actual retirement income was less than the IRA Target, P&G would make up the difference through an IRA Supplement.[1]

13. To calculate the IRA Supplement, the Policy took in to account the actual amount the employee would receive from the P&G pension plan of the "home country," as well as the actual amount received from the home country's state pension, if applicable.

14. As a P&G UK employee, Mr. Crabbe is entitled to pension benefits under the P&G UK Pension Plan.  He is also entitled to a UK state pension.

15. Messrs. Crabbe and Chavarria exchanged many emails that discussed in detail how Mr. Crabbe's IRA Supplement would be calculated under the terms of the Policy.

16. On November 1, 2007, Mr. Chavarria wrote that the IRA Supplement calculation "looks at how much is the individual actually receiving (or going to receive) from the former home country plans. . . . It is important that these figures are as close to reality as possible given that they will then be used as offsets to the IRA Target. . . . If the funds actually generated by the former country plans exceed the target then no IRA payment is needed."

17. Based upon the Policy and Mr. Chavarria's representations on P&G's behalf, Mr. Crabbe decided to localize to the US, becoming a P&G US employee and permanently moving his family to America.

18. From that time until April 19, 2018, neither P&G nor any other entity related to P&G communicated to Mr. Crabbe that anything but his "actual retirement income" would be used in calculating the IRA Supplement.

---

[1] For the sake of clarity, "IRA" in the context of this Complaint refers to P&G's International Retirement Arrangements, not individual retirement accounts.

19. Around May 2009, Mr. Crabbe received a Policy summary from the International Retirement Pension department. Consistent with prior representations and the Policy itself, the summary confirmed that the IRA Supplement calculation used "actual pension income/payments."

20. The 2009 summary included example calculation tables that used actual payments from former home countries, and not the net present value or any other value.

21. In 2010, Mr. Crabbe attended a training session with Becky Lawrence, a P&G International Benefits Practice Leader, along with approximately twenty other European P&G employees. Ms. Lawrence's presentation included a printed handout. The handout confirmed that the IRA Supplement formula was based on actual payments.

22. On February 12, 2018, Mr. Crabbe emailed P&G's Global Pension Administration asking for an estimate of his retirement benefits, using December 31, 2018 as his anticipated date of retirement.

23. On April 9, 2018, the Global Pension Administration replied via email with an estimate. The estimate did not use the terms of the Policy to calculate Mr. Crabbe's retirement income. Instead, it used a document Mr. Crabbe had never seen: P&G's International Retirement Arrangement Plan ("the Plan," attached hereto as Exhibit B).

24. The Global Pension Administration properly considered Mr. Crabbe's P&G UK pension annuity and state pension benefits as IRA Offsets, but it converted their payments to the net present value of the lump sum of these benefits. The estimate then converted the sums from GBP to USD with an exchange rate of 1.41710.

25. Because the IRA Offsets were larger than the IRA Target, the Global Pension Administration concluded that Mr. Crabbe was not due any IRA Supplement.

26. If P&G had used actual payments received rather than lump sums converted to net present value, Mr. Crabbe would be entitled to an IRA Supplement.

4

27. This estimate was the first time that Mr. Crabbe learned that the Plan differed in any way from the Policy upon which he had previously and detrimentally relied. Prior to this point, Mr. Crabbe never received any indication from any source that contradicted the information that led him to uproot his family and move to the US.

28. Mr. Crabbe replied on May 30, 2018, disputing the estimate and noting that the original Policy's terms used the actual payments received rather than the net present value of lump sums.

29. Mr. Crabbe also pointed out that the estimated UK government benefit (state pension) used by the Global Pension Administration was incorrect. It had assumed 32 years of employment with P&G UK, but Mr. Crabbe had only worked 24 years with P&G UK.

30. Mr. Crabbe also noted that the calculation used for the UK Defined Benefit Pension lump sum was incorrect, and that the estimate used the wrong exchange rate.

31. On behalf of the Global Pension Administration, Paul Augustine replied on June 29, 2018, rejecting each of Mr. Crabbe's points. Mr. Augustine maintained that Mr. Crabbe's "IRA calculation was calculated according to the terms of the IRA Plan, which is consistently applied to all IRA participants, and is therefore deemed correct as calculated."

32. On July 2, 2018, Mr. Crabbe provided data on his UK state pension as well as proof of his 24 years of service with P&G UK.

33. Taking this new data into account, Mr. Augustine replied on July 10, 2018, and repeated that Mr. Crabbe would still receive no IRA Supplement.

34. Mr. Crabbe wrote back on July 11, 2018, and contended that Mr. Augustine was still using the wrong exchange rate. Mr. Crabbe provided the correct value based upon Bloomberg, the data source that the International Pension group said it used.

35. The following day, Mr. Augustine updated the calculation with a revised exchange rate, but the calculation still showed an IRA Supplement of zero.

36. Because Mr. Augustine concluded that Mr. Crabbe's IRA Offsets exceeded his IRA Target, Mr. Crabbe's claim for benefits under the Plan was denied.

37. On August 21, 2018, Mr. Crabbe appealed the determination to the IRA Committee.

38. The IRA Committee consists of three P&G employees who are appointed by a P&G Vice President.

39. Writing for the IRA Committee, P&G employee Dave A. Tiersch denied Mr. Crabbe's appeal on October 25, 2018.

40. The IRA Committee acknowledged that the Policy quoted by Mr. Crabbe in his appeal was a previous version of the Plan.

41. The Committee noted that the operative language had changed, and that the current version of the Plan dated September 2016 controlled the decision.

42. Mr. Crabbe had never received an updated or amended version of the Plan since he made the decision to localize to the United States in 2008.

43. Defendants did not provide notice to Mr. Crabbe of any plan modifications that changed his entitlement to benefits under the Plan, thereby denying him the opportunity to pursue alternative solutions to offset any changes to his retirement income.

44. On January 11, 2019, Mr. Crabbe wrote to the IRA Committee to request a copy of the IRA Plan and "IRA Plan Document" referenced in the IRA Committee's decision; a copy of all Plan documents and amendments made to the Plan, beginning with the Policy that Mr. Crabbe had relied on; a copy of all documents and communications concerning any changes to the Policy/Plan; all communications to Mr. Crabbe concerning his benefits or changes to the Policy/Plan; and all documents and information upon which the decision was based, that were generated in making the

benefit determination, that were submitted from any source, that were considered, or that referenced or explained the net present value formula used in the benefit determination.

45. P&G then sent Mr. Crabbe the updated Plan for the first time. He did not receive any documents showing that Defendants had ever communicated Plan changes to Plan participants.

46. Mr. Crabbe retired from his employment with P&G on December 31, 2018, and has received no IRA Supplements to date.

## COUNT I
## BREACH OF FIDUCIARY DUTY – 29 U.S.C. § 1132(a)(3)

47. The preceding paragraphs are incorporated herein by reference.

48. P&G's International Retirement Arrangement Plan is subject to ERISA.

49. An entity is a fiduciary with respect to a plan to the extent that it exercises any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21).

50. Defendant P&G U.S. Business Services Company is a fiduciary with respect to the Plan because the Plan names it as the Plan Administrator.

51. Defendant P&G is the Plan's sponsor. 29 U.S.C. 1002(16)(B). P&G is also a fiduciary with respect to the Plan because P&G U.S. Business Services Company administers the Plan "at the direction" of P&G's Vice President of Global Business Services, who in turn appoints the IRA Committee members.

52. Through its IRA Committee and Global Pension Administration, Defendants have discretionary authority to determine whether an employee would become eligible to receive benefits under the Plan.

53. ERISA requires fiduciaries to discharge their duties solely in the interests of plan participants "with the care, skill, prudence and diligence under the circumstances that a prudent

7

[person] acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104.

54. The duty to disclose is a component of ERISA's fiduciary duties. To that end, fiduciaries must apprise inform participants of changes to the plan. ERISA requires fiduciaries to furnish participants with a summary of material modifications to the plan or otherwise notify participants of the changes in an updated summary plan description. 29 U.S.C. §§ 1022, 1024(b).

55. Mr. Crabbe relied on Defendants' representations in moving his family to the United States.

56. Defendants made material changes to the Plan that affected Mr. Crabbe's entitlement to retirement income benefits.

57. Defendants failed to notify Mr. Crabbe of changes to his benefit entitlement through a summary of material modifications, an updated summary plan description, or any other means, until it denied his claim for benefits in late 2018.

58. Defendants breached their fiduciary duties by failing to notify Mr. Crabbe of the changes to the Plan that affected his entitlement to benefits.

59. As a direct and proximate result of Defendants' misrepresentations, omissions, and failure to apprise Mr. Crabbe of his entitlement to benefits under the Plan, Mr. Crabbe suffered damages and is entitled to relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff James Crabbe demands judgment against Defendants as follows:

(a) That he be awarded all appropriate, make-whole equitable relief to redress Defendants' breaches of fiduciary duty pursuant to 29 U.S.C. § 1132(a)(3), including but not limited to equitable estoppel, reformation, and/or surcharge representing the

monetary benefits he would have received under P&Gs former Policy as represented to him;

(b) That he be awarded pre-judgment and post-judgment interest;

(c) That he be awarded reasonable attorney's fees and costs;

(d) That he be compensated for the adverse tax consequences of receiving a lump sum award rather than his benefits over several, separate tax years; and

(e) That he be awarded all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

*/s/ Elizabeth Asbury Newman*
Elizabeth Asbury Newman (0096921)
Jon B. Allison (0073955)
Trial Attorneys for Plaintiff
FREKING MYERS & REUL LLC
600 Vine Street, 9th Floor
Cincinnati, OH 45202
PH: 513/721-1975 - FX: 513/651-2570
*enewman@fmr.law*
*jallison@fmr.law*